RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 7/8/14

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| DERRICK DEWAYNE DAVIS,<br>    Plaintiff<br><br>VERSUS<br><br>WINNFIELD CORRECTIONAL<br>FACILITY, et al.,<br>    Defendants | CIVIL ACTION<br>SECTION "P"<br>NO. 1:08-CV-00938<br><br><br>JUDGE DEE D. DRELL<br>MAGISTRATE JUDGE JAMES D. KIRK |

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a civil rights complaint filed by Derrick Dewayne Davis ("Davis") pursuant to 42 U.S.C. § 1983, in forma pauperis, on June 23, 2008 and amended on July 16, 2008 (Doc. 6), December 1, 2008 (Doc. 9), July 6, 2009 (Doc. 23), and June 29, 2010 (Doc. 42). The named defendants are Corrections Corporation of America ("CCA") (operator of the Winn Correctional Center ("WCC") in Winnfield, Louisiana), WCC warden Timothy Wilkinson (in his individual capacity), Dr. Alfonzo Pacheco (a medical doctor employed at WCC) (in his individual and official capacities), and WCC Medical Director Pat Thomas (in her individual capacity). Davis contends that he was given inadequate medical care while he was an inmate in the Winn Correctional Center ("WCC") in Winnfield, Louisiana in 2007 through 2010.

In his original complaint and first amended complaints (Docs. 1, 6), Davis contended that he was given inadequate medical care at

WCC in July 2007. Davis contended that, even though his medical chart states that he is allergic to penicillin, he was given penicillin three days in a row, which caused allergic reactions of rash, shortness of breath, vomiting, swollen eyes, and dizziness (Doc. 1). That claim was dismissed (Doc. 15). In his second and third amended complaints (Docs. 9 & 23), Davis alleged that, since he arrived at WCC in April 2007, he has received inadequate medical care for his back and hip pain and his headaches because he has not received anything but a walking cane and Ibuprofen three times per day for hip and back pain, and that he has not had any diagnostic testing for his worsening headaches (Doc. 9); that denial of medical care claim was preserved and is now before the court (Doc. 15).

Counsel was appointed to represent Davis (Doc. 33) and a "second amended complaint" was filed, alleging denial of medical care for severe headaches with nose bleeds, hip pain, and back pain from 2008 through 2009 (Doc. 42). For relief, Davis asks for general, special and punitive damages, costs and legal interest (Doc. 42).

The court ordered that the amended complaint in Doc. 42 superceded the previous amended complaints in Docs. 6 and 9 (Doc. 41).

Warden Wilkinson, Pat Thomas (Doc. 48), Dr. Pacheco (Doc. 49), and CCA (Doc. 51) answered the complaint and requested a jury

trial. The defendants then filed a joint motion for summary judgment with a statement of material facts and documentary evidence (Docs. 68, 71). Davis filed briefs opposing defendants' motion for summary judgment (Docs. 86, 88), to which defendants filed replies (Docs. 87, 88).

Defendants' motion for summary judgment is now before the court for disposition.

## Law and Analysis

Rule 56 of the Federal Rules of Civil Procedure mandates that the court shall grant a summary judgment:

> "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

> "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order."

Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a

3

genuine issue to be tried.

In this regard, the substantive law determines what facts are "material." A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999), and cases cited therein.

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial. In this analysis, we review the facts and draw all inferences most favorable to the nonmovant. Herrera v. Millsap, 862 F.2d 1157, 1159 (5th Cir. 1989). However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment. Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.), cert. den., 506 U.S. 825, 113 S.Ct. 82 (1992).

Summary of Davis' Medical Records

Defendants show, in the medical records attached to their motion for summary judgment, that Davis arrived at WCC on April 7,

4

2008, using a crutch due to his bad knees and injured back (Doc. 71, Ex. 1, p. 13).

Davis' medical transfer summary from Forcht Wade Correctional Center showed Davis had been diagnosed with asthma, degenerative joint disease at L5-S1, major depressive disorder (Doc. 71, Ex. 1, p. 14), a ruptured disc in his back, cavities, and a broken denture, and was taking Albuterol (Doc. 71, Ex. 2, p. 71). A series of spinal X-rays taken at Forcht Wade Correctional Center in March 2008 showed some narrowing of the disc space at L5-S1 and mild annular bulging at L4-5 and L5-S1, but no spinal stenosis and his right hip (right femoral head and neck) was intact (Doc. 71, Ex. 1, p. 53 and Ex. 3, pp. 64, 67, 74-76). Davis' history and exam also showed he had been exposed to chemicals three years ago and acquired asthma for which he used a pump daily, he had a ruptured disk due to an injury in 1994, a decreased range of motion in his right shoulder due to an old injury, reduced weight bearing in his right hip, "right sciatica," a decreased range of motion in his right leg, and pain in his lumbar spine, and had been advised to do gentle range of motion/strengthening exercises for his right leg to treat his right side sciatica (Doc. 71, Ex. 1, p. 11 and Ex. 3, p. 63). Davis was placed on light duty with crutches, was prescribed Albuterol, and was to follow up in the pulmonary clinic (Doc. 71, Ex. 1, p. 11). Davis was also given compound duty, a crutch, and a bottom bunk (Doc. 71, Ex. 3, p. 29).

On April 9, 2008, Davis was examined in the pulmonary chronic care clinic, his pulmonary disease was found to be mild, and his Albuterol was refilled (Doc. 71, Ex. 2, pp. 56-57). Davis was placed on duty in the compound, given a crutch, assigned a bottom bunk, and not allowed to play sports (Doc. 71, Ex. 3, pp. 41, 61-62). Davis asked the medical director to order x-rays for his hip and lower back, and was told there was no indication that x-rays were necessary (Doc. 71, Ex. 3, p. 59). Davis again requested x-rays, contending he has a pinched nerved in his back that causes a lot of pain (Doc. 71, Ex. 3, p. 60). Davis was told that his prior jail had not made an appointment or recommended surgery, he already had x-rays, and he had been prescribed gentle range of motion exercises (Doc. 71, Ex. 3, p. 60). In May 2008, Davis asked for a cane instead of a crutch and complained of right hip pain (Doc. 71, Ex. 3, p. 58), for which he was prescribed an analgesic balm (Doc. 71, Ex. 3, pp. 58).

In May 2008, Davis made an emergency sick call complaining of headaches and dizziness, and reported having been shot in the head in 1994 (Doc. 71, Ex. 3, p. 38). Davis was given Motrin, which he refused (Doc. 71, Ex. 3, pp. 55-57).

On June 16, 2008, Davis requested a cane to replace his crutch due to bruising under his arm (Doc. 71, Ex. 2, p. 50). Davis also filed an ARP concerning his chronic headaches, which he believed merited an x-ray or a CT scan, Dr. Pacheco had declined to order

those tests (Doc. 71, Ex. 2, p. 53). Davis contended that he had been shot in the head a couple of years previously and that a spot had been seen in his head by the doctors at LSU Health Sciences Center, but the jail he was in (previously) would not allow him to go to his follow-up visit at LSU (Doc. 71, Ex. 2, p. 53). In June 20, 2008, Dr. Pacheco ordered that Davis be given the use of a cane or a crutch and given a bottom bunk (Doc. 71, Ex. 3, p. 28).

In June 2008, Davis was placed on duty inside the compound, given one crutch for three months, assigned a bottom bunk, and could not play sports (Doc. 71, Ex. 3, p. 39); later, the crutch was changed to a cane (Doc. 71, Ex. 3, p. 40), then discontinued altogether (Doc. 71, Ex. 3, p. 40). Davis was then seen for complaints of headaches and blurred vision for three months, for which he was given Motrin (Doc. 71, Ex. 3, p. 53). Davis than filed an ARP, complaining he had not been given x-rays or a CT scan for his headaches, blurred vision and occasional nose bleeds, and that he has a family history of blood clots and tumors (Doc. 71, Ex. 2, p. 53).

In July 2008, Davis was examined for back pain, but he refused to undergo a complete examination; it was noted that he had possible sciatica and that his crutch was not necessary, so it was discontinued, but he remained on compound duty and no sports (Doc. 71, Ex. 2, p. 51 and Ex. 3, p. 39). The crutch was returned to Davis in October 2008, and he was given Motrin and compound duty

(Doc. 71, Ex. 3, pp. 38, 42).

Also in July 2008, Davis complained of headaches and nausea; he was diagnosed with tension headaches and prescribed an analgesic (Doc. 71, Ex. 3, p. 43). Davis asked for a CT scan, but the examination revealed no evidence of neurological deficits that would require a CT scan (Doc. 71, Ex. 3, p. 44). Davis also asked for crutches, but he was told his evaluations had not revealed a medical diagnosis to justify use of crutches, so Davis left before his medical exam was completed (Doc. 71, Ex. 3, p. 44). Davis then filed complaints with the medical director that the infirmary had not examined his head for blood clots or tumors (Doc. 71, Ex. 3, pp. 45-50).

On August 7, 2008, Davis complained to the optometrist of headaches for the past year and was diagnosed with ocular migraines (Doc. 71, Ex. 4, p. 100). On August 27, 2008, Davis intraocular pressure was checked (Doc. 71, Ex. 4, p. 99); it was checked again in December 2008 and Xalatan was prescribed (Doc. 71, Ex. 4, p. 98).

Davis' prescriptions for Celexa and Haldol were discontinued in December 2008 and he was prescribed Xalatan; his Albuterol was also refilled (Doc. 71, Ex. 1, p. 69).

In January 2009, Davis' intraocular pressure was again checked and he was again prescribed Xalatan (Doc. 71, Ex. 4, p. 97). Undated examination notes show the optometrist found Davis'

8

intraocular pressure was a little high and he refilled the prescription for Xalatan (Doc. 71, Ex. 2, p. 27).

Davis had a pilonidal cyst, or abscess, for which he was referred to LSU Health Sciences Center in February 2009 (Doc. 71, Ex. 1, p. 68, 73 and Ex. 3, pp. 100-102), and which was treated with daily dressings in March, April and May 2009 (Doc. 71, Ex. 1, p. 67, 75-76). That cyst was surgically removed in September 2009, and a colon polyp removed in May 2010 at LSU Health Sciences Center (Doc. 71, Ex. 1, pp. 43, 57, 71, 72 and Ex. 3, pp. 78-99).

Also in February 2009, Davis complained of chest pain, was diagnosed with gastroesophogeal reflux disease, and was prescribed BASA, Malox, and Prilosec (Doc. 71, Ex. 3, pp. 34-37).

In July 2009, Davis again had restrictions for remaining in the compound, using a bottom bunk, no sports, and using a cane (Doc. 71, Ex. 1, pp. 42, 66). Davis was also see in the Chronic Care Clinic; his Albuterol prescription was refilled and the dressing was changed on his draining cyst (Doc. 71, Ex. 2, pp. 45).

In August 2009, a health evaluation showed Davis had normal range of motion in his upper and lower extremities and no headaches or dizziness (Doc. 71, Ex. 3, p. 31). Also in August 2009, Davis filed request forms with the medical director for medical care for the infection in the surgical site where the cyst was removed, complaining he had not been given anything for the infection except band aids (Doc. 71, Ex. 1, pp. 78 and Ex. 2, p. 42). Davis was

9

informed that his LSU Health Sciences Center appointment had been rescheduled (Doc. 71, Ex. 2, pp. 42). Davis was see in the LSU Health Sciences Center in August and September 2009, and the cyst was excised (Doc. 71, Ex. 1, pp. 98-99 and Ex. 3, pp. 78-90).

In September 2009, Davis asked to see the doctor for severe pain in his lower back; he was told to make a sick call request for his back pain (Doc. 71, Ex. 1, p. 77). Davis stated his lower back had begun hurting three days before and had worsened until he could not walk due to the pain and his back "locked up" (Doc. 71, Ex. 1, pp. 79-81). Davis also stated that the pain radiated to his left leg and he had difficulty bearing weight on the left leg; objectively, Davis had tenderness in the left sacroiliac joint area and he was diagnosed with acute exacerbation of left sciatica (Doc. 71, Ex. 1, p. 82). The doctor prescribed Flexeril for one month and ordered Davis to lay in for two days; Davis was also sent to the ENT clinic (Doc. 71, Ex. 1, pp. 62, 82).

In October 2009, Davis wrote an inmate request form to the Medical Director concerning the pain and infection at the incision site where the cyst was removed, and complained that the medication was upsetting his stomach (Doc. 71, Ex. 2, pp. 41). Davis was kept in the medical ward and given daily dressing changes from October 6-9, 2009 (Doc. 71, Ex. 4, pp/ 101-107). In October 2009 and January 2010, Davis was prescribed Flagyl, Pepto Bismol, Tetracycline, Prilosec, Percogesic, Amoxicillin and daily dressings

for an infection where his pilonidal cyst had been surgically removed, and was sent to LSU for treatment of the incision site infection (Doc. 71, Ex. 1, pp. 40-41, 58, 63-64, 70). Davis' Xalatan was refilled from December 2008 through October 2009 (Doc. 71, Ex. 2, p. 80 - Ex. 3, p. 4) and his Albuterol was refilled from May 2008 through November 2009 (Doc. 71, Ex. 2, p. 77 - Ex. 3, p. 22). Davis also received a Ventilin Inhaler in April 2009 (Doc. 71, Ex. 2, p. 99).

In January 2010, Davis was seen in the WCC Chronic Care Clinic for chronic recurrent sinus infection, and was referred to LSU (Doc. 71, Ex. 1, pp. 5-6 and Ex. 2, p. 40), where he was diagnosed with strep and prescribed Flagyl and Tetracycline (Doc. 71, Ex. 1, p. 95). Davis' Albuterol was refilled in December 2009, and February, March and April 2010 (Doc. 71, Ex. 1, pp. 22-23, 26, 28, 33). Davis' Xalatan prescription was refilled in February and April 2010 (Doc. 71, Ex. 1, pp. 22, 29). Davis' Albuterol was refilled in May 2010 (Doc. 71, Ex. 1, p. 21).

In January and April 2010, Davis was referred to the surgery clinic at LSU for a colonoscopy and for excision of a peri-anal fistula (Doc. 71, Ex. 1, pp. 37, 39, 57, 90-91). One polyp was found and removed during his colonoscopy (Doc. 71, Ex. 1, pp. 3, 83, 86-89). Davis was placed in the infirmary from January 16 to January 21, 2010 in order to assist him with dressing and care of his cyst (Doc. 71, Ex. 1, pp. 58-59); a trip to LSU Medical Center

resulted in an appointment to again surgically remove the cyst in February 2010 (Doc. 71, Ex. 1, p. 97).

In June 2010, Davis was seen in the WCC clinic; Davis did not voice any complaints, he was prescribed a cane and a bottom bunk, and he was told he could not play sports (Doc. 71, Ex. 1, pp. 2, 35).

Davis received mental health treatment while he was in WCC (Doc. 71, Ex. 1, pp. 103-106 and Ex. 2, pp. 1-21, Ex. 3, pp. 103-106, Ex. 4, pp. 1-79).

Davis also received dental care while he was in WCC (Doc. 71, Ex. 2, pp. 22-27, 46, 62-63, Ex. 4, pp. 80-100).

<u>Medical Care</u>

Davis contends the defendants denied him appropriate medical care at WCC from 2008 through 2010 for his hip pain, back pain, and headaches. Davis alleges that, when he was transferred from Forcht Wade Correctional Center to WCC on April 13, 2007, the medical staff at WCC was notified of, and provided medical records for, Davis' medical conditions relating to his hip and back injuries (Docs. 23, 42).

Under the Eighth Amendment, a lack of proper inmate medical care can be "cruel and unusual punishment" only if it is "sufficiently harmful to evidence deliberate indifference to serious medical needs." <u>Estelle v. Gamble</u>, 429 U.S. 97, 97 S.Ct. 285 (1976). The Supreme Court defined "deliberate indifference" as

"subjective recklessness", or, in other words, a conscious disregard of a substantial risk of serious harm. Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1980 (1994). Therefore, in order to show that his medical care violated the Eighth Amendment, an inmate must allege that prison officials were deliberately indifferent to his serious medical needs. Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997), citing Estelle v. Gamble, 429 U.S. at 106, 97 S.Ct. at 292 (1976). Subjective recklessness, as used in the criminal law, is the appropriate test for deliberate indifference. Norton, 122 F.3d at 291, citing Farmer, 511 U.S. at 838-40, 114 S.Ct. at 1980.

Because an inadvertent failure to provide adequate medical treatment does not violate the Eighth Amendment, deliberate indifference does not include a complaint that a physician has been negligent in diagnosing or treating a medical condition, Estelle, 97 S.Ct. at 291, or a difference of medical opinion between the prison's medical staff and the inmate about what medicines or treatments the inmate should be receiving, Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs. Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997).

A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Easter v. Powell, 467 F.3d 459, 464 (5th Cir. 2006), citing Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). A prison official is deliberately indifferent to serious medical needs of prisoners if he intentionally denies or delays access to medical care. Walker v. Butler, 967 F.2d 176, 178 (5th Cir. 1992); Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).

Davis has not provided any medical evidence that his hip and back require surgery. A complete set of x-rays of his lower back and right hip were taken just before he arrived at WCC and were sent with him. The x-rays clearly show that his back problem is mild and does not yet warrant surgery, and there was no problem with his hip joint.

Moreover, Davis has not shown any evidence of blood clots or tumors in his head. There is no evidence that Davis exhibits any symptoms other than occasional severe intraocular migraines which cause nausea and nosebleeds.

This claim amounts to a disagreement as to the type of treatment Davis is receiving. See Hickman v. Moya, 181 F.3d 97 (5th Cir. 1999). Inmates are entitled to reasonable medical care, not

to the best medical care that money can buy. <u>Mayweather v. Foti</u>, 953 F.2d 91 (5th Cir. 1992). There is no evidence that the medications and treatment Davis is receiving are inappropriate, or that CT scans and surgery are indicated or necessary. There is also no evidence that defendants have been deliberately indifferent to Davis' serious medical needs. The medical records show that Davis' complaints have been addressed in a reasonable manner and not ignored.

Therefore, defendants' motion for summary judgment should be granted on the issue of denial of medical care for Davis back and hip pain and headaches.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that defendants' motion for summary judgment (Doc. 68) be GRANTED and that Davis' action against all defendants on his remaining denial of medical claims be DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required

15

nor encouraged. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 7th day of July 2014.

```
                                    _____
                                         JAMES D. KIRK
                                    UNITED STATES MAGISTRATE JUDGE
```